**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **ORION 180 INSURANCE COMPANY,**<br><br>**Plaintiff/Counter-Defendant,**<br><br>**v.**<br><br>**DAVID PEACOCK,**<br><br>**Defendant/Counter-Plaintiff.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 2:24-cv-113-CWB** |

**MEMORANDUM OPINION AND ORDER**

## I. Introduction

The central question in this action is whether insurance proceeds must be paid as the result of a residential fire loss. Orion 180 Insurance Company is seeking to void the underlying insurance policy on grounds that the policy application contained various misrepresentations. David Peacock on the other hand is asserting that Orion 180 failed to comply with its legal obligations following the fire loss and therefore is responsible for paying both the policy proceeds and bad faith damages. The parties have requested respective awards of summary judgment on their competing theories. Having carefully reviewed and considered the arguments and evidence of record, the court finds that questions of material fact exist so as to preclude summary judgment on the contract dispute but that summary judgment is appropriate with respect to Peacock's tort claim for bad faith.

## II. Procedural Background

Orion 180 filed a Complaint for Declaratory Judgment (Doc. 1) on February 15, 2024 wherein it sought a judicial determination that the underlying policy of insurance is void and subject to rescission under Alabama law. The policy at issue facially applies to a dwelling located at 15830 Padgett Road in Andalusia, Alabama. (*Id*. at p. 2, ¶ 5; Doc. 1-2 at p. 5). Peacock was named as the sole defendant to the Orion 180 claim. (Doc. 1).

The core allegation by Orion 180 is that "Peacock made material misrepresentations concerning the location of the dwelling, prior unrepaired damage to the dwelling, that he has an insurable interest in the Property, the size of the Property, and the risk to Orion 180." (*Id*. at p. 6, ¶ 20). Orion 180 thus asserts that it may rescind the policy by virtue of Ala. Code § 27-14-7:

> (a) All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefor, by, or in behalf of, the insured or annuitant shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:
>
> (1) Fraudulent;
>
> (2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
>
> (3) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract at the premium rate as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

(Doc. 1 at p. 6, ¶ 23: "Pursuant to Alabama Code § 27-14-1 *et seq*. and applicable case law, Orion 180 is entitled to rescind the … Policy or otherwise avoid the … Policy."; *see also id*. at ¶¶ 20-22).

Peacock in turn filed an Answer to deny that Orion 180 is entitled to its requested relief. (Doc. 11 at pp. 1-3). Moreover, Peacock included a Counterclaim (*id*. at p. 4) to assert claims against Orion 180 for breach of contract (*id*. at p. 7) and bad faith (*id*. at p. 8) under Alabama law. Peacock is seeking to recover the benefits allegedly owed under the policy, along with all other available damages. (*Id*.). Proceedings have been pending for quite some time, and the record reflects that extensive discovery has taken place.

The parties are in agreement that the subject residence suffered a total loss by fire on or about November 14, 2023. (Doc. 1 at pp. 3-4, ¶ 10; Doc. 11 at p. 2, ¶ 10 & p. 4, second ¶ 3). It likewise is undisputed that the subject insurance policy provided applicable limits of at least $190,000. (Doc. 1 at p. 2, ¶ 4; Doc. 11 at p. 2, ¶ 4 & p. 2, first ¶ 11).

Orion 180 now is requesting that summary judgment be entered in its favor on the original claim for declaratory relief, *i.e.*, that it is excused by Ala. Code § 27-14-7 from all obligations it otherwise might have under the policy. (*See* Docs. 113 & 114). Orion 180 seeks a corresponding entry of summary judgment on the counterclaims asserted by Peacock for breach of contract and bad faith. (*See* Docs. 111 & 112). And Peacock similarly is requesting that the court enter summary judgment in his favor with respect to Orion 180's claim for rescission. (Doc. 107).[1] All issues have been briefed at length and are ripe for determination. (Docs. 117 through 125).[2]

## III. Jurisdiction and Venue

Orion 180 is considered a citizen of Indiana and Florida (Doc. 17), and Peacock is a citizen of Alabama (Doc. 18). The amount in controversy at all times has more likely than not exceeded $75,000 exclusive of interest and costs. (Doc. 1 at p. 2, ¶ 4; Doc. 11 at p. 2, ¶ 4). The court thus possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). Neither personal jurisdiction nor venue has been contested, and the record supports both. *See* 28 U.S.C. § 1391; *see also* Fed. R. Civ. P. 4(k)(1)(A).

---

[1] It does not appear that Peacock is seeking an entry of summary judgment on his affirmative claims for breach of contract and bad faith.

[2] Because both of Orion 180's summary judgment motions were filed conventionally with sealed exhibits after having already been filed electronically without sealed exhibits, the docket shows each motion currently pending under two separate entries. Accordingly, the clerk of court is hereby **DIRECTED** to terminate the two electronic versions (Docs. 102 & 104). The court will refer to the versions that were accompanied by sealed exhibits (Docs. 111 & 113).

## IV. Legal Standard

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party… . [A fact] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (citation omitted). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to establish that entry of judgment as a matter of law is not appropriate. *See id*. at 324; *see also* Fed. R. Civ. P. 56(c)(1).

## V. Factual Background[3]

This dispute involves insurance coverage obligations on a portion of rural property in Andalusia, Alabama. (Doc. 1; Doc. 11). The greater property at issue was originally owned by Peacock's grandparents. (Doc. 107-10 at p. 17, depo. pp. 65-67). Approximately 10 acres were held under a single property description but commonly known by two different addresses: 15830 Padgett Road and 15780 Padgett Road. (Doc. 107-4 at p. 14, depo. p. 53; Doc. 107-5 at p. 3, depo. p. 11; Doc. 107-10 at pp. 5, 9, depo. pp. 19-20, 35; Doc. 114-5 at p. 3). The specific portion of property at issue is a yellow residence located at 15830 Padgett Road. (Doc. 107-6; Doc. 107-10 at p. 9, depo. pp. 35; Doc. 114-5 at p. 3).

[3] The facts as stated herein are taken from the evidentiary exhibits attached to the parties' summary judgment filings, reflect the facts deemed material to a proper resolution of the summary judgment issues, and have been construed most favorably to the non-movant in each instance where applied.

The yellow residence at 15830 Padgett Road at one time had been occupied by Peacock's grandparents. (Doc. 114-5 at p. 65). As their health declined, the grandparents moved into a mobile home that was placed onto the 15780 Padgett Road property, and Peacock's parents moved into the yellow residence at 15830 Padgett Road. (*Id.*). Peacock's brother also moved into the 15780 Padgett Road mobile home in approximately 2014 to assist in caring for the grandmother but ultimately stayed on to assist in caring for other relatives as well. (Doc. 107-10 at pp. 9-10, depo. pp. 35, 39-40; Doc. 114-5 at p. 15). Peacock's mother was the last living of the ancestors and died in March of 2022. (Doc. 107-10 at p. 18, depo. p. 72; Doc. 112-4 at p. 16). Peacock thereafter contacted his insurance agent to place coverage on the property—resulting in an August 2, 2022 application with Orion 180 and a first policy of insurance. (Doc. 107-4 at p. 11, depo. p. 42; Doc. 107-5 at p. 5, depo. pp. 19-20; Doc. 1-1).

Although placed through Orion 180, the policy was issued by Trisura Insurance Company. (Doc. 107-5 at pp. 5-6, depo. pp. 19-21). Peacock was assisted by his own agent in completing the policy application (*id.* at pp. 3-4, 6, depo. pp. 12-16, 22-23), and the agent submitted the application on Peacock's behalf (*id.* at p. 7, depo. pp. 26-27). (*See also* Doc. 107-4 at p. 9, depo. p. 35 & Doc. 114-5 at p. 5). The policy remained in effect from August 2, 2022 through August 2, 2023 and expired without a claimed loss. (Doc. 112-1 at pp. 4, 34-116).

By the time the policy was up for renewal, Orion 180's relationship with Trisura had ended. (Doc. 107-1 at pp. 6, 10-11, 47-48, 55, depo. pp. 23-24, 40-42; Doc. 107-5 at p. 14, depo. p. 55). Orion 180 therefore issued a new policy in its own name for the period between August 2, 2023

and August 2, 2024. (Doc. 1-2; Doc. 107-3 at p. 5, depo. p. 18; Doc. 107-5 at p. 9, depo. pp. 36; Doc. 112-1 at p. 4).[4]

The dwelling insured under the policy sustained a total fire loss on November 14, 2023. (Doc. 1-3; Doc. 107-4 at p. 7, depo. p. 27; Doc. 112-1 at p. 4). Following a period of investigation that included a referral to the Special Investigations Unit, the assignment of both a field adjustor and a cause and origin investigator, informal interviews, and a formal examination of Peacock under oath (Doc. 107-3 at pp. 17-19, depo. pp. 65-69, 73; Doc. 112-1 at pp. 4-5; Doc. 112-6; Doc. 112-14 at pp. 5, 8, depo. pp. 51, 57; Doc. 114-5), Orion 180 initiated this action on February 14, 2024 to seek a declaration of its rights and obligations (Doc. 1).

## VI. Discussion

### A. Contract Issues

Whether viewed in terms of Orion 180's claim for declaratory judgment or in terms of Peacock's claim for breach of contract, the dispositive issue is the same: whether the record is sufficient for the court to determine <u>as a matter of law</u> that policy benefits are or are not payable as a result of the underlying fire loss. The answer to that question is no. Although Orion 180 contends that "numerous material misrepresentations" made by Peacock during the application process entitle it "to rescind the policy pursuant to Ala. Code § 27-14-7" (Doc. 114 at p. 23), a closer look at the alleged misrepresentations reveals why the issue cannot be decided at the

---

[4] The evidence is somewhat equivocal whether a formal application was prepared and submitted to Orion 180 for the August 2, 2023 to August 2, 2024 policy (Doc. 107-5 at pp. 5, 9, 10, 14-16, depo. pp. 20, 36, 40, 56, 58-59, 61-62; Doc. 112-1 at pp. 126-29; Doc. 107-1 at pp. 12-13, depo. pp. 47-51), and the record does not contain a copy of a signed application. Regardless, any question as to whether a second application was prepared has no bearing on the court's resolution of the summary judgment issues. *See Ex parte Quality Cas. Ins. Co.*, 962 So. 2d 242 (Ala. 2006).

summary judgment stage. But conversely, the evidence presented by Orion 180 is sufficient to defeat Peacock's contention that summary judgment should be entered for breach of contract.

**i. "This home is not vacant or unoccupied and if it's a secondary or seasonal home, this home is regularly overseen by a reputable party living within 50 miles of the residence." – "True" (*See* Doc. 1-1 at p. 3 & Doc. 1-2 at p. 13).**

Orion 180 contends that Peacock misrepresented that the subject properly was "regularly overseen by a reputable party living within 50 miles of the residence." (Doc. 114 at p. 23). In his examination under oath, Peacock stated that his brother and a neighbor kept regular watch over the property. (Doc. 114-5 at pp. 12-13). But according to Orion 180, summary judgment should be entered based upon evidence that Peacock's brother "had not been living [at the property] for at least a month and a half to two months prior to the loss" and that "[t]he neighbor … did not have a key and could not have been overseeing the [p]roperty." (Doc. 114 at p. 23).

In addition to his examination under oath, Peacock also gave sworn deposition testimony that his brother lived next door during most of the period at issue and would monitor the property:

> Q. … What gave you the feeling that Bill was a regular overseer of the property?
>
> A. Because he's my family member that lives next door and he passed by it on a daily basis and he could see it from his front door.
>
> Q. Did you talk to Bill about being a regular overseer of the property?
>
> A. Yes. He checked on the house. Yes. We talked about him keeping an eye on the house, letting me know if anything was out of sorts … .

(Doc. 107-4 at p. 8, depo. pp. 31-32). Peacock's brother testified in a similar manner:

> Q. … Is there any particular subject that you and David would speak about when you did talk back in 2022 and 2023?
>
> A. Not really. He'd check up and see how things were going down there, make sure everything was working right … . I mean, but just basically maintenance, upkeep, anything going wrong … .

(Doc. 107-10 at p. 6, depo. p. 23; *see also* Doc. 114-5 at pp. 12-13).

It is accurate that the record further reflects that Peacock's brother began to stay with another brother in the Birmingham area shortly prior to issuance of the August 2023 policy (Doc. 107-4 at pp. 8-9, depo. pp. 32-33; Doc. 107-10 at p. 3, depo p. 10; Doc. 114-5 at p. 19), but the record also reflects that he initially intended to stay in the Birmingham area only for the Memorial Day weekend of 2023, ended up traveling "back and forth" over the ensuing months, and did not consider himself to have permanently moved from the property until October of 2023 (Doc. 107-10 at pp. 3, 6-9, depo. pp. 10, 23-30, 33; Doc. 114-5 at pp. 14-16; Doc. 107-4 at p. 8, depo. p. 32).

And as to the neighbor, the record reflects that he routinely hunted and fished on the property with Peacock's permission, physically visited the property on a regular basis, spoke with Peacock throughout the year, and updated Peacock as to any issues he observed with the property—including making the call to notify Peacock of the fire loss. (Doc. 107-4 at p. 8, depo. pp. 30-31; Doc. 107-11 at pp. 7, 10-14, depo. pp. 28, 38, 43-44, 46-47, 50-56). Peacock described the arrangement as follows:

> Q. What gave you the feeling that Daniel was a regular overseer of the property?
>
> A. Other than the fact that we discussed that he kept an eye on the property for me, he also had a written permission from me to visit the home -- in addition to him verbally stating that he kept an eye on the property for me, he had a written permission from myself to be on the property to hunt and fish, which he did throughout the year. He and his wife fished in that catfish pond every week, and during hunting season he was out there multiple days a week, and he himself said he kept an eye on the property for me.

(Doc. 107-4 at p. 8, depo. pp. 30-31; *see also* Doc. 114-5 at p. 13: "[H]e keeps a regular eye and check on the property for me."). For his part, the neighbor denied ever being asked to serve as an "overseer" or "caretaker" of the property and stated that he had never gone inside the residence. (Doc. 107-11 at pp. 9, 11, depo. pp. 34-36, 42, 44). Yet the neighbor testified that he routinely

came to the property for hunting and fishing purposes—including to "keep check on [the] place." (*Id*. at pp. 11, 15, depo pp. 43-44, 58). The neighbor further testified that he was on the property dozens of times per year—sometimes as frequently as four times per week—and would have notified Peacock had he seen anything or anyone suspicious. (*Id*. at pp. 13-14, depo. pp. 51-52, 56). And the neighbor acknowledged having specifically told Peacock that he would "keep an eye on the property":

Q. And so you told [Peacock] also, I'll keep an eye on the property for you?

A. Yes, sir.

(*Id*. at p. 14, depo. pp. 54-55). That testimony is consistent with the sworn deposition given by Peacock's brother who described the neighbor as "the guy that was watching over the house." (Doc. 107-10 at p. 11, depo. p. 42; *id*. at pp. 11-12, depo. pp. 44-45: "You know, he'd keep a good eye on it for us. Then we always let him hunt there. I thought that was fair enough."; *see also id*. at pp. 12-13, depo. pp. 47-50).

No assertion has been made, nor has the court determined on its own, that the policy application provided any definitions or other guidance for how an applicant should interpret the phrases "regularly overseen" and "living within 50 miles." In the absence of such clarity, the court concludes that the totality of evidence presents a genuine dispute of material fact as to whether Peacock misrepresented that "this home is regularly overseen by a reputable party living within 50 miles of the residence," *i.e.*, whether the actions by his brother and/or neighbor were sufficient to constitute "regularly oversee[ing]" the home and, in the event only the actions of his brother were, whether his brother was "living within 50 miles of residence."

**ii. "This home is situated on no more than 5 acres of land, unless in a Planned Community and on no more than 10 acres." – "True" (*See* Doc. 1-1 at p. 3 & Doc. 1-2 at p. 13).**

Orion 180 contends that Peacock misrepresented the size of the property, *i.e.*, whether the dwelling was situated on greater than 5 acres not in a planned community. (*See* Doc. 114 at p. 24). Peacock did initially state in his examination under oath that the total size was approximately 22 acres—comprised of the residential property insured by Orion 180, an adjoining residential property, and "all the land that's out there." (Doc. 114-5 at pp. 10, 12-13, 19, 22; Doc. 120-1; Doc. 107-10 at pp 5-6, depo. pp. 20-21). By his sworn deposition, however, Peacock was able to clarify that the property where the two residences were located was only 10 acres:

> Q. Why did you deny Number 2?
>
> A. The property -- the house is on a piece of property that is 10 acres, but the acreage is divided in half based on the address, so there's two pieces of property there that occupy five acres apiece. So there's one that was a mobile home that occupied the five acres on the right side and there's property on the left side.

(Doc. 107-4 at p. 5, depo. p. 18; *see also id*. at p. 11, depo pp. 41-42: "They were each on a five-acre stretch."; *id.* at p. 12, depo. p. 45). Peacock's sworn deposition testimony further explained that the 10 acre parcel is composed of separate residences with separate addresses with separate mailboxes and are subject to separate insurance policies and separate utility bills. (*Id*. at pp. 12, 14, depo. pp. 45, 53-54).

Once again, the court finds no guidance in the application or elsewhere as to how an applicant should interpret the phrase "situated on." Whether 15830 Padgett Road could be deemed "situated on" 5 acres of the larger, undivided 10-acre parcel that additionally included 15780 Padgett Road thus presents a genuine dispute of material fact as to whether Peacock misrepresented the property size. This is especially so given sworn testimony from the agent who

placed the policy that she had been informed expressly by Orion 180 to divide the total acreage between the two residences:

> A. … And then I asked about the acreage because there's -- I don't know what the acreage is, but there's two properties. How do you divide the acreage? And they told me it was divided by the address. So that's the question I asked.
>
> Q. And you don't remember the response you got?
>
> A. They told me it was divided by the address.
>
> Q. Divided by the address.
>
> A. Right. There's two homes on the land. How is the land divided? And they told me it was divided by the address.

(Doc. 107-5 at p. 6, depo. pp. 23-24; *see also id*. at p. 7, depo. p. 26).

**iii. "This property is not in the course of construction, has no existing damage and is not in a state of disrepair." – "True" (*See* Doc. 1-1 at p. 3 & Doc. 1-2 at p. 12).**

Orion 180 contends that Peacock misrepresented whether the property had any pre-existing, unrepaired damage—pointing to evidence of unrepaired water damage to the ceiling. (*See* Doc. 114 at p. 25). The issue arose during Peacock's examination under oath as follows:

> Q. … Was there any prior unrepaired damage to the house that burned down …?
>
> A. The only thing that I can think anything that would have been in need of attention, repair, there was one spot in the living room next to the fireplace chimney, it looked like there may have been some moisture getting in there, but that -- it was not repaired, but it was just you know how you see a little bit of moisture spots in the drywall and the ceiling right there. So that's the only part that I can think of that needed repair that I would say needed some attention, but it was just a small little water spot near in the corner of the chimney in the living room.
>
> Q. Okay. So the house wasn't in a course of construction or in a state of disrepair or having any preexisting damage that you're aware of other than that one spot?
>
> A. No, sir.

(Doc. 114-5 at p. 8). Peacock's brother later described the alleged "damage" as merely a "[b]rown spot and a little bit of sagging … [i]n the drywall … [l]ike the size of my fist." (Doc. 107-10 at p. 19, depo. p. 76). Perhaps most significantly, he testified that the leaking area was repaired "[r]ight after it started" by "replac[ing] the flashing around the chimney." (*Id*. at p. 20, depo. pp. 77-78). Because the application contains no definition or guidance for how an applicant should interpret the phrase "existing damage," such as whether it encompasses cosmetic remnants of a prior leak, the testimony concerning the ceiling issue is sufficient to create a genuine dispute of material fact as to whether Peacock misrepresented the condition of the property.

**iv. "Home is deeded to, and/or owned by a corporation, LLC, Partnership, estate, association or any other business entity." – "No." (*See* Doc. 1-1 at p. 1 & Doc. 1-2 at p. 11).**

Orion 180 contends that Peacock misrepresented the ownership status of the property by stating that it was not owned by an estate. (*See* Doc. 114 at p. 27). As with the terms in other questions on the application, however, "estate" is not defined. Moreover, the context in which it appears within the application is sandwiched between a number of express <u>business</u> entities—"corporation," "Partnership," and "association." (Doc. 1-1 at p. 1; Doc. 1-2 at p. 11). The final qualifier indeed is "any <u>other</u> business entity." (*Id*.; *see also* Doc. 119-6 at p. 2, depo. p. 19). Under such circumstances, the court finds a genuine dispute of material fact to exist as to whether Peacock's response was a misrepresentation, *i.e.*, whether "estate" as used in the question included inherited property that had not formally been deeded to a decedent's heirs.[5]

---

[5] The court further is mindful that Alabama law contemplates that real property automatically devolves at death such that the 15830 Padgett Road property would not necessarily have been "owned by" the decedent's estate. *See* Ala. Code § 43-2-830(a) ("Upon the death of a person, decedent's real property devolves … to decedent's heirs."); *Schlumpf v. D'Olive*, 203 So. 3d 57, 60 (Ala. 2016) ("In the absence of a decedent's disposition of real property in a last will and testament, an intestate decedent's real property passes to his or her heirs by operation of law."); *compare* Ala. Code § 43-2-830(b) ("[P]ersonal property devolves to the personal representative").

The court additionally observes the following September 16, 2022 email from Peacock to Orion 180 related to his self-inspection report and photographs:

> Just to clarify, [t]his was my mom's home. She just passed. I am going to keep this house as a secondary home.

(Doc. 107-8 at p. 1). Because Alabama courts "have consistently held that where an insurance company has no knowledge or indications of a condition concealed by a misrepresentation in an application, it is entitled to void the policy, but where it knows the facts, knows the falsity of the statements on the application, <u>or has 'sufficient indications that would put a prudent person on notice so as to induce an inquiry which, if done with reasonable thoroughness, would reveal the truth</u>,' a question of fact is presented as to whether the insurer is entitled to void the policy," *Duren v. Nw. Nat. Life Ins. Co*., 581 So. 2d 810, 815-16 (Ala. 1991) (citations omitted), the court finds that the email creates another genuine dispute of material fact, *i.e.*, whether Orion 180 had sufficient indications to induce an inquiry into how the inherited property was titled.

**v. Other grounds for rescission cannot be raised at the summary judgment stage.**

The Complaint focused on the following specific examples of alleged misrepresentations:

> 7. In the Application, Peacock represented that "This property is not in the course of construction, has no existing damage and is not in a state of disrepair." Exhibit "1" at page 3 (emphasis added). Peacock also represented that the "…home is regularly overseen by a reputable party living within 50 miles of [the Property]." *Id*. Finally, Peacock represented that "This home is situated on no more than 5 acres of land, unless in a Planned Community and on no more than 10 acres." *Id*.

(Doc. 1 at p. 3). The Complaint even embedded an image of the policy application that highlighted Peacock's responses to the particular questions. (*Id*. at p. 2, ¶ 6). And the Complaint later added reference to the ownership status of the property. (*Id*. at p. 4, ¶ 12). All alleged misrepresentations discussed in the Complaint are couched in terms of those limited issues. (*Id.* at pp. 4-6, ¶¶ 13-14, 17, 20).

Nothing reasonably gleaned from the Complaint can be construed as seeking rescission of the Orion 180 policy on any other grounds. Nonetheless, Orion 180 has sought summary judgment on the following additional alleged misrepresentations in the policy application:

- "Construction Type Siding" – "Frame" (*See* Doc. 1-1 at p. 1 & Doc. 1-2 at p. 9);
- "This home is not a rental home or used for any rental purpose." – "True" (*See* Doc. 1-1 at p. 3 & Doc. 1-2 at p. 13); and
- "Protection Class" – "3" (*See* Doc. 1-1 at p. 1 & Doc. 1-2 at p. 11).

(*See* Doc. 114 at pp. 2, 26-28). Because none of those grounds for rescission were asserted in the Complaint, and because no attempt was made to amend the Complaint properly, Orion 180 will not be permitted to raise them at this late stage. It is a basic pleading maxim that a complaint is required to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (emphasis added) (citation omitted).

As this court previously has observed, "[a] plaintiff generally cannot change the basis of his claims at the summary judgment stage." *Williams v. Lesaffre Yeast Corp.*, No. 21-cv-324, 2023 WL 2316180, at *7 (M.D. Ala. Mar. 1, 2023) (citing *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) ("[A]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).") (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004))). This includes modifying the factual basis for an asserted legal theory:

> MSPA's complaint did not give Covington notice of its claim that Covington's primary-payer status could be established based on its settlement with P.M. The amended complaint did not even mention the word "settlement" in a relevant context. It alleged only that "[Covington]'s no-fault and liability policies are primary plans, which rendered [Covington] a primary payer for accident-related medical expenses."

> … MSPA had the information it needed to plead the claim it now asserts. Covington alerted MSPA to the settlement agreement in March 2020 in its amended answers to MSPA's second set of interrogatories. MSPA filed its motion for summary judgment in March 2021. Even so, MSPA did not amend its complaint in the interim. MSPA responds that "Covington knew full well ... that MSPA Claims had become aware" of the settlement. But that fact, even if true, would not relieve MSPA of its obligation to follow the pleading requirements and allege in its complaint that the settlement agreement served as a basis for liability.

*MSP Recovery Claims, Series LLC v. United Automobile Ins. Co.*, 60 F.4th 1314, 1319-20 (11th Cir. 2023); *see also Williams*, 2023 WL 2316180 at *8 ("Consistent with *Hurlbert*, this Court will not consider Williams' new theory for his religious discrimination claim in ruling on Lesaffre's motion for summary judgment.") (citing *Hulbert*, 439 F.3d at 1297).

Orion 180 cannot escape this framework by asserting that its additional arguments simply are other grounds permitting rescission under the same statute, Ala. Code § 27-14-7, when those grounds for rescission were not stated in the Complaint. *See Harris v. Dep't of Child. & Fams.*, No. 21-11581, 2022 WL 247982, at *3 (11th Cir. Jan. 27, 2022) ("The district court correctly found that Harris could not rely on her November 7 and 8 e-mails as the basis for her protected activity because her second amended complaint relied only on her November 15 complaint."); *Gadsby v. Am. Golf Corp. of California*, 557 F. App'x 837, 839 (11th Cir. 2014) ("On appeal, the members contend that a genuine issue of material fact remains regarding whether the owners breached the Purchase Contract, Bylaws, and Upgrade Offer by failing to: (1) provide the members with exclusive access to the Club's amenities; (2) build a hotel and a total of 81 holes at the various golf courses at the Club; (3) refund the members' deposits; and (4) advance them on the transfer list in accordance with the Bylaws. … First, because the members' exclusive-use allegations were not made in the complaint and were, instead, raised for the first time in response to the owners' motion for summary judgment, that claim is not properly before us.") (citing *Gilmour*,

382 F.3d at 1314-15); *Richards v. Headley*, No. 19-cv-845, 2021 WL 2784278, at *5 (M.D. Ala. July 2, 2021) ("[T]he actions alleged in the Complaint are not described as non-exclusive examples of a greater course of conduct. The Complaint alleged one way that Defendant was guilty of deliberate indifference and wrongful death … . The facts alleged in Plaintiff's summary judgment response are not an elaboration of evidentiary details; they are an impermissible attempt to 'move the goalposts' by substituting an entirely new factual predicate for his claims at the summary judgment stage without amending his pleadings. As mentioned above, the Court can consider only the claims and theories of liability actually pleaded in the Complaint. … Plaintiff is not entitled to raise new factual allegations for the purpose of changing the basis of his legal theories at the summary judgment stage.") (citing *Hurlbert*, 439 F.3d at 1297); *Tindol v. Ala. Dep't of Revenue*, No. 13-cv-92, 2015 WL 350623, at *24-25 (M.D. Ala. Jan. 23, 2015) ("Again, Mr. Tindol is bound to the complaint that he pleaded and which he chose not to amend, and he may not change the theories upon which he seeks relief through summary judgment briefing.") (citing *Gilmour,* 382 F.3d at 1315).

And it cannot be argued that these additional grounds for rescission were uncovered during discovery such that Orion 180 could not have included them within the Complaint. The matters at issue were discussed with Peacock during his pre-suit examination under oath (Doc. 114-5 at pp. 11, 18) and were long known to Orion 180 (Doc. 119-5 at pp. 2-3, depo. pp. 154, 157; Doc. 114 at pp. 8-9, 12, ¶¶ 16, 18, 21; Doc. 112-1 at p. 4, ¶ 13). Orion 180 thus could have asserted such additional "grounds" in the Complaint or a timely amendment yet elected not to do so.[6]

---

[6] The court is unpersuaded by Orion 180's argument that a generic reference in the Complaint to "material misrepresentations concerning ... the risk to Orion 180" is broad enough to encompass additional, non-specific grounds for rescission. (Doc. 124 at p. 3; Doc. 1 at pp. 6, ¶¶ 20-21). The logical reading of that language in context is that "the risk" references risk posed by the particular misrepresentations alleged earlier in the same sentence—especially considering the Complaint

**vi. The impact of any alleged misrepresentations cannot be determined at this time.**

"A federal court sitting in diversity jurisdiction applies the substantive law of the forum state, which, in this case, is Alabama." *J & M Assocs., Inc. v. Romero*, 488 F. App'x 373, 376 (11th Cir. 2012) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938)); *see also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("[F]ederal courts sitting in diversity apply state substantive law and federal procedural law.") (citing *Erie*, 304 U.S. at 78). Here, both Orion 180 and Peacock have invoked Alabama law without further discussion as to why it provides the applicable standard for evaluating either Orion 180's claim for rescission or Peacock's claim for breach of contract.

But a court applying Alabama law must "first look to the contract to determine whether the parties have specified a particular sovereign's law to govern." *Blalock v. Sutphin*, 275 So. 3d 519, 523 (Ala. 2018) (quoting *Stovall v. Universal Constr. Co.*, 893 So. 2d 1090, 1102 (Ala. 2004)). Only if the contract is silent in that regard does the court proceed to *lex loci contractus* by applying the law of the state where the contract was formed. *Id*. Perhaps that doctrine would yield a result consistent with the parties' approach of applying Alabama law. However, the court observes that the underlying insurance policy contains what appears to be an express choice of law provision:

---

referenced the statutory requirement of Ala. Code § 27-14-7(a)(2) that misrepresentations must be "[m]aterial … to the acceptance of the risk … by the insurer … ." (*See* Doc. 1 at p. 5, ¶ 16: "Orion 180 respectfully submits that Peacock made incorrect statements of fact … that were material to Orion 180's acceptance of the risk in the Renewal Policy … ."). There is no indication that the phrase "the risk" was intended to serve as a catchall for multiple other undisclosed misrepresentations. *Cf. Patterson v. Liberty Nat'l Life Ins. Co.*, 903 So. 2d 769, 782 (Ala. 2004) ("Any notice provided by the combination of Liberty National's discovery requests, its pre-lawsuit letter to Patterson, and its motion for a summary judgment would be insufficient … to save Liberty National from the consequences of its failure to plead misrepresentation … on all of the issues of misrepresentation tried in this case.") (footnote omitted).

> Z. Venue
>
> This policy and any performance there under shall be construed with and governed by the laws in the county of Marion, state of Indiana.

(*See* Doc. 1-2 at p. 34). It thus seems that Indiana law very well could control the contract issues. Neither side has spoken to that possibility, and the court cannot presume on the current record that the choice of law provision has been waived.

The good news is that Indiana contract law is substantially similar to Alabama contract law on issues surrounding the parties' respective claims. Under Indiana common law, for example, "a material misrepresentation or omission of fact in an insurance application, relied on by the insurer in issuing the policy, renders the coverage voidable at the insurance company's option." *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 672 (Ind. 1997). And just as in Alabama, "[w]hether the applicant intended to mislead or knew of the falsity is irrelevant … ." *Id*. at 673. Also as in Alabama, "an insurer cannot avoid coverage where it had knowledge of the facts notwithstanding the material misrepresentations, or where a reasonable person would have investigated further and the investigation would have uncovered the truth." *Id*. at 674. Potential application of Indiana law therefore would not disturb Orion 180's right to seek rescission if the above-discussed disputes of fact are resolved in its favor such that Peacock is determined to have committed one or more misrepresentations.

However, Indiana law and Alabama law differ in other important respects. As has been addressed already, Ala. Code § 27-14-7 permits an insurer to deny coverage or rescind a policy if a misrepresentation (1) is fraudulent, (2) is material either to the acceptance of the risk or to the hazard assumed by the insurer, or (3) if the insurer in good faith would not have issued the policy in the same manner. Under Indiana law, there is no such third prong—meaning a misrepresentation has to be either fraudulent or material. *See Guzorek*, 690 N.E.2d at 672-73.

Orion 180 has made no argument that the misrepresentations by Peacock were fraudulent—relying instead on Ala. Code § 27-14-7(2) and (3). Yet if Indiana law were to be applied, Orion 180 could not avail itself of the third prong of Ala. Code § 27-14-7 and would be limited to demonstrating that a misrepresentation was "material" as that term has been defined by courts applying Indiana law, which could be more expansive or more limited than what would be permitted by Alabama law. It therefore would be imprudent for the court to decide at this stage whether Orion 180 automatically would be entitled to rescind the policy if a jury determines that Peacock did commit one or more of the misrepresentations being alleged. It instead must be determined first whether Alabama law or Indiana law will supply the rule of decision at trial, and that issue has not been placed before the court.

**B. Bad Faith Counterclaim**

As stated above, the court has found factual disputes to exist surrounding Orion 180's obligations under the subject insurance policy so as to preclude the entry of summary judgment in favor of either Orion 180 or Peacock on the contract issues. However, Orion 180's request for summary judgment on Peacock's counterclaim for bad faith requires additional analysis.[7]

In his response to Orion 180's summary judgment motion, Peacock frames his bad faith claim as being based on "substantial evidence from which a jury could conclude that Orion 180 conducted a one-sided investigation that only focused on reasons for denial and created its own reasons for denial." (Doc. 117 at p. 4). Peacock points to Alabama law requiring that an insurer fully investigate a claim and subject the claim to cognitive review. *See, e.g., State Farm Fire &*

[7] The court notes that bad faith is a tort claim and that under Alabama's doctrine of *lex loci delicti* the court must apply the law of the state where the injury occurred, *i.e.*, Alabama. *See LaBrake v. State Farm Mut. Auto. Ins. Co.*, No. 20-cv-1430, 2021 WL 1603242, at *8 (N.D. Ala. Apr. 23, 2021); *American Safety Indem. Co. v. Fairfield Shopping Ctr., LLC*, No. 12-cv-2415, 2016 WL 3878496, at *23 (N.D. Ala. July 18, 2016).

*Cas. Co. v. Slade*, 747 So. 2d 293, 315-16 (Ala. 1993). But Peacock's contention is belied by the undisputed timeline of events—beginning with his reporting of the loss to Orion 180 on November 15, 2023. (Doc. 1-3). A desk adjuster was assigned the same day and contacted Peacock for an initial telephone interview. (Doc. 107-3 at p. 17, depo. pp. 65-66; Doc. 112-6 at p. 2). Because it involved a fire loss, the claim was assigned to the Special Investigations Unit the next day (Doc. 107-3 at p. 17, depo. pp. 67-68; Doc. 112-14 at p. 5, depo. p. 51)—resulting in additional interviews conducted with Peacock, his brother, and his neighbor. (Doc. 112-14 at p. 8, depo. p. 57; Doc. 125-1). A field adjuster also was assigned, along with a cause-and-origin investigator. (Doc. 107-3 at pp. 18-19, depo. p. 69, 73-76; Doc. 112-6 at p. 2). At the same time, Orion 180 was investigating potential natural causes, valuing the loss, and adjusting reserves. (Doc. 112-6 at pp. 3-4). Orion 180 notified Peacock of its reservation of rights by late November and requested additional documentation. (Doc. 112-6 at p. 3). Counsel for Orion 180 then conducted an examination under oath of Peacock on January 26, 2024 as contemplated and permitted by the insurance policy (Doc. 1-2 at p. 31; Doc. 112-2 at p. 7; Doc. 114-5), after which various issues were discussed internally by Orion 180 regarding concerns that representations made in the policy application had been inaccurate. (Doc. 119-5 at pp. 2-3, depo. pp. 154, 157; Doc. 121-3). Shortly thereafter, Orion 180 initiated these proceedings on February 15, 2024 to seek a declaration that it is entitled to rescind the policy due to certain of those alleged misrepresentations. (Doc. 1).

Peacock also cannot present sufficient evidence to create an issue of fact that Orion 180 manufactured its own reason for denial. There is nothing beyond conjecture that Orion 180 applied more rigorous standards at the claims stage than at the underwriting stage. The record reflects that policies placed with Orion 180 were based upon specific required responses to a series of questions

that included those at issue in this litigation. (Doc. 107-5 at p. 5, depo. pp. 18-19; Doc. 112-1 at pp. 2-3, 5, ¶¶ 5-7, 17). No evidence has been presented that Orion 180 did not consistently require identical responses to those questions in order for a policy to be issued or that it did not rely upon those responses as provided in an original application or a renewal application. In fact, Orion 180 has submitted a host of other policies that reflect consistent responses to the same questions. (Doc. 112-1 at pp. 5, 10, ¶¶ 18, 29; *id*. at p. 117 through Doc. 112-3 at p. 114). And it cannot be disputed that Orion 180 again relied upon Peacock's original application responses when agreeing to be bound by the renewal policy—whether or not a new application was signed. (*Compare* Doc. 1-1 and Doc. 1-2 at pp. 11-14; *see also* Doc. 107-1 at pp. 12-13, depo. pp. 47-50). Nor can it be disputed that Orion 180 has rescinded other policies in the same general area during the same general time period for alleged misrepresentations as to the same application questions. (Doc. 112-1 at pp. 5-6, 11, ¶¶ 18, 35; Doc. 112-3 at pp. 115-180). So in dealing with Peacock's claim, Orion 180 certainly was not purporting to rely upon "subjective underwriting" standards that were being "pull[ed] off a shelf" for the first time. *See Loyal American Life Ins. Co., Inc. v. Mattiace*, 679 So. 2d 229, 238 (Ala. 1996). Orion 180 instead reached the conclusion that Peacock's responses to certain questions nullified its obligations.

Even construing the facts most favorably to Peacock, the court finds as a matter of law that Orion 180 conducted a sufficient investigation and identified specific issues that might call into question its obligations under the policy. Because the court already has found the evidence sufficient to create fact issues as to those questions, summary judgment is due to be entered on Peacock's claim for bad faith. *See Old S. Life Ins. Co. v. Spann*, 472 So. 2d 987, 989 (Ala. 1985) ("Old Southern asserts that it may deny the claim under the authority of Code 1975, § 27-14-7, because of Mrs. Spann's omissions or concealment of material facts. In an action for breach

of contract there would be at least one issue of law—whether the application was ambiguous in relation to psychiatric treatment—and several issues of fact … . [B]ut Old Southern is not guilty of bad faith refusal to pay for raising these defenses."); *Holt v. Am. Mod. Home Ins. Co.*, 695 F. Supp. 3d 1327, 1338 (N.D. Ala. 2023) ("[N]o reasonable jury could conclude that American Modern's proffered reason for denial—invocation of § 27-14-7 based on materially incorrect statements in Mr. Holt's application—was not a colorable justification for American Modern's denial of the claim. The Court has discussed extensively above the application of § 27-14-7 to the facts here and the existence of genuine issues of material fact as to whether the statute affords American Modern a basis for denying Mr. Holt's claim."); *Brown v. Yaring's of Texas, Inc.*, 643 F. Supp. 3d 1304, 1333-34 (S.D. Ala. 2022) ("Whereas, the Court has determined that genuine issues of material fact remain as to whether coverage was properly denied based on the passenger warranty and/or failure to disclose the May 23, 2020 incident, the bad faith claim fails."); *Nationwide Mut. Fire Ins. Co. v. Guster L. Firm, LLC*, 944 F. Supp. 2d 1116, 1133 (N.D. Ala. 2013) ("Alternatively, the bad faith claim fails also because Nationwide had arguable reasons to deny Guster Law's claim, *i.e.*, whether Guster Law had an insurable interest and whether the misrepresentations in the applications entitled Nationwide to rescind the polices under Section 27-14-7.") (citations omitted).[8]

---

[8] Although Peacock's counterclaim for bad faith was broadly worded (*see* Doc. 11 at p. 8, ¶¶ 24-27; *see also id*. at pp. 5-7 at ¶¶ 5-19), he articulated no basis for bad faith in opposition to summary judgment other than on the grounds addressed herein. All other potential grounds for the bad faith counterclaim will be deemed abandoned. *See Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citations omitted).

## VII. Conclusion

For the reasons set out above, it must be left to a jury to evaluate the surrounding evidence and decide (1) whether any of Peacock's application responses constituted a misrepresentation that would give rise to rescission or (2) whether Orion 180 is in breach of its contractual obligations. *See* 6 Couch on Ins. § 81:42 ("If a question in an application is vague and ambiguous, a reasonable interpretation of that question by the applicant may be of controlling effect … or at the least, a jury question is raised as to the reasonableness of the insured's interpretation."); *see also Caribbean I Owners' Ass'n, Inc. v. Great Am. Ins. Co. of New York*, 600 F. Supp. 2d 1228, 1241 (S.D. Ala. 2009) ("Given the ambiguities in the application form, the Court cannot find as a matter of law that Caribbean I's failure to disclose the construction defects and maintenance issues as 'claims or losses' amounted to a misrepresentation or omission supporting rescission … .").

Accordingly, it is hereby **ORDERED** as follows:

- that the motion for summary judgment filed by Orion 180 (*see* Doc. 113) as to its claim for declaratory judgment is **DENIED**;
- that the motion for summary judgment filed by Orion 180 (*see* Doc. 111) as to the counterclaims asserted by Peacock is **DENIED** as to the claim for breach of contract but **GRANTED** as to the claim for bad faith;
- that the motion for summary judgment filed by Peacock (Doc. 107) is **DENIED**; and
- that the parties must file a status report no later than **October 14, 2026** regarding their preferred trial setting of December 14, 2026, January 11, 2027, or February 1, 2027 and also must include their views on whether pre-trial mediation should be resumed with a private mediator or at no cost with a Magistrate Judge.

**DONE** this the 30th day of September 2026.

**CHAD W. BRYAN**
**UNITED STATES MAGISTRATE JUDGE**